This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**ERNEST MONTOYA, individually and in his capacity as trustee of the Montoya Living Trust,**

Plaintiff-Appellee/Cross-Appellant,

v.                                                                     **No. 28,673**

**VICTORIA MONTOYA ROMERO,**

Defendant-Appellant/Cross-Appellee,

and

**BOARD OF COUNTY COMMISSIONERS OF SANTA FE, MARCELLA MONTOYA ROMERO, ROSINA MONTOYA ROMERO, and ANTONIO ROMERO,**

Defendants/Cross-Appellees.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**James A. Hall, District Judge**

Coppler Law Firm, P.C.
Gerald A. Coppler
Santa Fe, NM

for Appellee/Cross-Appellant

Southwest Intellectual Property Services, LLC

Kevin Lynn Wildenstein
Albuquerque, NM

for Appellant/Cross-Appellee

Cassutt, Hays & Friedman, P.A.
Kenneth J. Cassutt
Thomas W. Banner
Santa Fe, NM

for Cross-Appellees Marcella,
Rosina, and Antonio Romero

## MEMORANDUM OPINION

**KENNEDY, Judge.**

In these cross-appeals, Ernest Montoya (Plaintiff) challenges the district court's order of summary judgment in favor of Defendants Board of County Commissioners of Santa Fe County (Board), Victoria Montoya Romero (Victoria), Marcella Montoya Romero (Marcella), Rosina Montoya Romero (Rosina), and Antonio Romero (Antonio) (collectively Defendants). The district court affirmed an administrative decision of the Board, which allowed Defendants to subdivide their property despite a disputed restrictive covenant to the contrary. We affirm the district court on this issue and hold that, pursuant to the agreement of the parties, Plaintiff did not receive an undivided interest in the disputed property until the fulfillment of all conditions precedent. In a related matter, Defendant Victoria appeals the district court's order that she pay Plaintiff's attorney's fees for her failure to file responsive pleadings. She

argues that the court, through verbal assurances from the bench, exempted her from such pleadings and immunized her from any resulting individual penalty. We disagree. Based on the record before us, there is nothing to indicate the court abused its discretion. We therefore also affirm the district court on this issue.

**BACKGROUND**

The facts and legal arguments surrounding Defendant Victoria's appeal, though connected procedurally to this litigation, are distinct from those necessary to decide the real property dispute. For that reason, we discuss her appeal in a separate section below.

For purposes of these cross-appeals, the following facts are undisputed. Sidney and Ursula Hayter were the owners of a 156-acre parcel of land in Santa Fe County. On February 7, 1990, the Hayters adopted a set of restrictive covenants to govern its use. The substance of those covenants is not at issue here, but they provided that amendments could be made only upon "written approval by owners of at least eighty percent (80%) of the acreage described herein[.]" Later that month, on February 23, 1990, the Hayters deeded a thirty-five-acre parcel to Plaintiff and Defendants as tenants in common.

Plaintiff filed an action to partition the property and sever the common tenancy in October 1998. The parties agreed to a binding arbitration to accomplish the

partition, and upon completion of that process the arbitrator awarded Plaintiff an undivided 8/35 interest in the property, also describing an eight-acre tract that would become his. The details by which the award was to be executed were memorialized by a contemporaneous settlement agreement that described Plaintiff's property as the eight-acre lot located at the north of the property. That agreement further provides:

> 1. The parties will retain [a surveyor] to survey the subject real property into three (3) lots of eight (8) acres each, one (1) lot of five (5) acres, one lot of four (4) acres and one (1) lot of two (2) acres.

> 2. One (1) eight-acre lot shall be the northern most portion of the property, with the southern boundary to be as close to a ninety (90) degree angle to the eastern boundary of this eight-acre tract as reasonably practicable.

> 3. The lot described in the preceding paragraph will be awarded to [Plaintiff].

> 4. The remaining five (5) lots will be surveyed in accordance with and upon the mutual agreement of [Defendants] . . .

> . . . .

> 6. Each of the parties and his or her spouse will quitclaim the lot to the party to which it is awarded in the [a]rbitration [a]ward.

> 7. The surveyor shall create along the entire length of the western boundary of the subject real property (including the lot awarded to [Plaintiff]) an easement for ingress and egress . . .

> 8. The [s]urvey shall be recorded and approved in accordance with applicable law.

> 9. The costs of surveying, recording and obtaining approval of

3

the plat of survey shall be borne by the parties in relation to the pro rata interests awarded to them.

> 10. Upon the satisfaction of the terms and provisions set forth above, the parties . . . will execute [r]eleases and any and all other documents as may be reasonable and necessary in order to . . . effectuate the terms and provisions of this [s]ettlement [a]greement.

Neither the arbitration award, nor the settlement agreement were presented to the court for confirmation or entry of judgment. The parties filed no deeds as contemplated by the settlement agreement. Following the arbitration, Plaintiff made various improvements to his eight acres and in doing so, spent several thousand dollars.

In 2002 the requirements imposed by the settlement agreement were still incomplete. Yet, along with other landowners not parties to this litigation, Plaintiff voted to amend the 1990 restrictive covenants applicable to the 156-acre tract. As passed, those amendments (the 2002 Amendments) provide that "[n]o lot within the [156-acre tract], whether created by subdivision, family transfer, court order, or otherwise (and regardless of governmental approval having been granted for the creation of said lot), shall be smaller than [two-and-a-half] acres in area." If Plaintiff's vote is included in the tally, it is undisputed that the 2002 Amendments were validly passed by 83.1% of landowners and comply with the 1990 restrictive covenants amendment procedures. Without Plaintiff's vote, however, the parties agree that

4

percentage of voters decreases to 77.98%, and the 80% condition is unmet. The original 1990 restrictive covenants contain no provision regarding minimum lot size.

All requirements of the parties' settlement agreement were completed no later than March 10, 2004, when a final plat was recorded with the Santa Fe County Clerk and the parties executed "quitclaim deeds, issued in accordance with the [a]rbitration [a]ward and [s]ettlement [a]greement." The quitclaim deeds officially conveyed to Plaintiff the eight acres he received in the agreement. The plat filed with the county also clearly designates Plaintiff's eight-acre tract and identifies an easement along the western boundary as required by the settlement agreement.

In April 2004 Defendants applied to the Santa Fe Extraterritorial Zoning Commission (EZC) to execute family transfers further subdividing the remaining twenty-seven acres. As sought by Defendants, such transfers would have produced several lots smaller than two-and-a-half acres. Plaintiff objected to the transfers on the basis that they violated the 2002 Amendments, which established a minimum lot size of at least two-and-a-half acres. Despite Plaintiff's objection, however, the EZC approved Defendants' family transfer application and Plaintiff appealed to the Board, which affirmed the transfers.

Plaintiff then appealed the Board's decision to the district court under Rule 1-074 NMRA (2002). The court granted a stipulated stay in that administrative appeal

5

so that it could first determine the validity of the 2002 Amendments in a separate declaratory judgment action. Also about this time, the parties filed what amounted to cross-motions for summary judgment and jointly entered stipulated facts for the court. A hearing was held on December 14, 2007, and in a written order dated April 17, 2008, the court granted summary judgment in favor of Defendants. Without addressing the existence or effect of the arbitration award, the court found that the parties' settlement agreement did not immediately "effect a partition of the [eight]-acre parcel allocated to Plaintiff . . . from the remainder of the [thirty-five]-acre parcel owned by Plaintiff and his siblings." As such, the court found that Plaintiff did not become the owner of the eight-acre parcel until the conditions of the settlement agreement were fulfilled, for example, "Until quitclaim deeds were exchanged among Plaintiff and his siblings." Therefore, at the time Plaintiff voted on the 2002 Amendments, he was still a tenant in common with Defendants.

The court concluded that Plaintiff "was not an 'owner' of a separate tract, and his signature on the [2002 Amendments] was ineffective without the additional signatures of his cotenants, i.e., Defendants and their other siblings." Reasoning that Plaintiff's invalid vote likewise invalidated the 2002 Amendments establishing the two-and-a-half acre minimum lot size, the court found that the Board acted properly in affirming the EZC. "Because the [2002 Amendments are] void and ineffective,

6

there is no covenant in effect against the tract of land or lots owned by Defendants and their siblings establishing a minimum lot size." As a result, the court concluded, "the [2002 Amendments do] not prohibit the division of the property of Defendants and their other siblings into lots less than [two-and-a-half] acres in size[.]" Accordingly, the court later held in favor of Defendants in Plaintiff's underlying administrative appeal.

Plaintiff now appeals the district court's order granting summary judgment in favor of Defendants. He argues the court erred in its analysis of the stipulated facts, specifically by invalidating the two-and-a-half-acre minimum lot size established by the 2002 Amendments. He contends that his ownership interest in the eight-acre tract was established in 1990 when he was made a tenant in common of the original thirty-five-acre tract. He further argues that the settlement agreement he entered into with Defendants severed the tenancy in common and partitioned ownership among the siblings. Plaintiff does not discuss the arbitration award. As a result, he argues, his vote on the 2002 Amendments, and therefore the amendments themselves, were valid.

**Validity of the 2002 Amendments Establishing Minimum Lot Size**

**A.      Standard of Review**

We review orders for summary judgment de novo. *Roybal v. Lujan de la Fuente*, 2009-NMCA-114, ¶ 9, 147 N.M. 193, 218 P.3d 879. "Summary judgment is

appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted). Motions for summary judgment should always be analyzed in the "light most favorable to a trial on the merits." *Id.* (internal quotation marks and citation omitted). Because the facts relevant to this issue were stipulated below, we concern ourselves only with whether the district court correctly applied the law. *See, e.g.*, *Barncastle v. Am. Nat'l Prop. & Cas. Cos.*, 2000-NMCA-095, ¶¶ 4-5, 129 N.M. 672, 11 P.3d 1234 (considering cross-motions for summary judgment on stipulated facts and analyzing only the district court's application of the law).

**B.    The Arbitration Award**

As a preliminary issue, the arbitration award did not effectively transfer the parties' interests in physical plots of land. The arbitration award "divide[d] the real property," in that it designated each cotenant's "undivided" percentage interest in the property. The award did not allocate plots of land to the parties, nor did it decide crucial issues like the transfer of deeds, boundaries and locations of each party's entitlement within the whole. These issues were separately resolved in the settlement agreement between the parties.

Moreover, we cannot treat the arbitration award as an enforceable judgment. According to NMSA 1978, § 44-7A-26(a) (2001), "[u]pon granting an order

8

confirming, vacating without directing a rehearing, modifying or correcting an [arbitration] award, the court shall enter a judgment in conformity therewith. The judgment may be recorded, docketed and enforced as any other judgment in a civil action." In accordance with this statute, *Padilla v. State Farm Mutual Automobile Insurance Company* sets out the procedure a party must use to avail themselves of an arbitration award. 2002-NMCA-001, ¶ 21, 131 N.M. 419, 38 P.3d 187. There, we stated that a party "may apply for judicial confirmation of the award . . . . Upon confirmation of the award, [the party] may enforce the judgment and may assert the judgment." *Id.*

There is no evidence that the court complied with the statute and granted an order confirming the arbitration award, or that a judgment confirming that the arbitration award was recorded. Moreover, in a January 24, 2002 letter to Plaintiff, Defendants' attorney stated that the parties needed "to get the . . . case reinstated, so that an Order can be entered confirming the Settlement Agreement and Arbitration Award." As of 2004, well after the 2002 Amendments were voted upon, the arbitration award was never confirmed by a court. Even now, we lack evidence of its confirmation. Thus, the arbitration award itself is unenforceable as a judgment without this evidence, even if the parties agreed to make the arbitration binding. As such, the arbitration award has no effect on our subsequent analysis of the settlement

agreement and transfer of title.

## C. The Dispositive Issue

Plaintiff contends he obtained title to the eight-acre tract by way of the original 1990 deed conveying title to him as a tenant in common with Defendants. The settlement agreement executed by the parties on August 2, 1999, he argues, only functioned to sever the unity of possession and did not create new title. If we properly understand this argument, Plaintiff asserts that although he already had title to the eight-acre tract, upon execution of the settlement agreement, he became free to participate in the vote to amend the restrictive covenants. Defendants argue that the settlement agreement was executory in nature. As such, they contend that it functioned to partition the property only upon the occurrence of certain conditions precedent. Defendants also claim that because the 2002 Amendments were passed prior to the fulfillment of those conditions, Plaintiff's vote—and as a result, the 2002 Amendments themselves—were invalid. We agree that Plaintiff's interest in the eight-acre tract turns upon the nature of the settlement agreement. If that agreement is executory in nature, partition did not occur until the fulfillment of the conditions precedent contained therein. Until that happened, Plaintiff retained only a tenancy in common. On the other hand, if the agreement is sufficient in and of itself to effect Defendant's division of the land, partition occurred upon execution of the agreement,

and Plaintiff's estate changed immediately from a tenancy in common to ownership of eight acres in fee.

This distinction is dispositive, because, as our Supreme Court held in *Landskroner v. McClure*, "a cotenant may not convey, alienate, or encumber the interest of another cotenant unless he is clearly and properly authorized to do so." 107 N.M. 773, 775, 765 P.2d 189, 191 (1988); *see Tex. Am. Bank/Levelland v. Morgan*, 105 N.M. 416, 417, 733 P.2d 864, 865 (1987) (holding that a cotenant may not mortgage the property of another cotenant). The district court recognized this issue. Moreover, it is undisputed that Plaintiff did not have permission to vote on behalf of the cotenancy regarding the 2002 Amendments. Thus, if Plaintiff possessed only a cotenancy at the time of his vote, his role was a nullity, and the 2002 Amendments failed to pass by 80 % as required by their terms.

**D.    The 1999 Settlement Agreement**

Tenants in common may establish a partition in several ways. They may ask the court to divide the common property, or they may have the court order a sale of the property and divide the proceeds among the cotenants. NMSA 1978, § 42-5-1 (1953); *see also* NMSA 1978, § 42-5-5 (1953). Tenants in common may also choose to partition by voluntary agreement, "orally or otherwise, so long as all of the cotenants have the capacity to contract." *In re Estate of Duran*, 2003-NMSC-008,

11

¶ 12, 133 N.M. 553, 66 P.3d 326.  As the authors of American Jurisprudence state,

> Partition is generally effected by the mutual conveyance or release to each co-owner of his or her own share, executed by all other owners. A written conveyance is standard, and when the agreement is in writing, it is not necessary that it be reduced to judgment or memorialized in a deed. Partition may also be effected by mutual deeds, which are binding contracts and subject to the usual rules of construction. They should be read and construed in the light of the circumstances attending their execution.
>
> A written, voluntary partition agreement is subject to rescission on the same grounds as any other contract.

59A Am. Jur. 2d Partition § 62 (2010) (footnotes omitted).  Plaintiff emphasizes that a partition does not vest new title in joint tenants.  To the extent partition actually occurs, Plaintiff is correct.  Instead of creating new title, partition simply severs "the unity of possession."  *Rodriguez v. La Cueva Ranch Co.*, 17 N.M. 246, 251, 134 P. 228, 229 (1912) (internal quotation marks and citation omitted).  It is well-settled that once partition is complete, each party possesses "precisely the same title which he had before; but that which before was a joint possession was converted into a several one."  *Id.* at 251-52, 134 P. at 229 (internal quotation marks and citation omitted). *Sims v. Sims* embodies a similar holding.  1996-NMSC-078, ¶ 57, 122 N.M. 618, 930 P.2d 153.  There, the Court observed, "A decree of partition does not create, manufacture, alter, or divest title to the property in question.  It does not change the origin or character of the property.  Its only effect is to sever the unity of possession;

12

jointly held property is converted into severally held property." *Id.* Plaintiff's reliance on this rule, however, fails to account for two related principles. First, if the settlement agreement in this case is executory, it did not immediately effectuate partition at the time it was signed. Unity of possession would not have been severed until fulfillment of all conditions precedent, including the exchange of deeds. Second, as discussed above, a joint tenant cannot act to bind other joint tenants without authorization to do so.

In the present context, the terms "executory contract" and "conditional conveyance" are functionally interchangeable; both can function to transfer real property at some later date upon the occurrence of condition(s) precedent. An executory contract is defined as "A contract that remains wholly unperformed or for which there remains something still to be done on both sides," *Black's Law Dictionary* 321 (7th ed. 1999), and a conditional conveyance is a transfer "*based on the happening of an event*, usu[ally] payment for the property; a mortgage." *Id.* at 334 (emphasis added). As this Court held in *Board of Education v. James Hamilton Construction Co.*, "[e]xecutory contracts are those contracts on which performance remains due to some extent on both sides." 119 N.M. 415, 419, 891 P.2d 556, 560 (Ct. App. 1994) (internal quotation marks and citation omitted). When parties enter an executory contract to transfer real property, it is well-established that no interest

vests until the occurrence of the condition(s) precedent announced in the contract. *See, e.g.*, *Torris v. Dysart*, 72 N.M. 26, 28, 380 P.2d 179, 181 (1963). The first and only time our appellate courts have been called to analyze this problem in any detail was more than one hundred years ago. In *De Bergere v. Chaves*, our Supreme Court considered whether an instrument signed by the parties was a deed conveying title or merely an executory contract promising to convey title at some future date. 14 N.M. 352, 364, 93 P.762, 764 (1908). In relevant part, the instrument before the Court provided,

> I, . . . for consideration, have sold and transferred in favor of Jesus M. Sena y Baca and Agapita Ortiz, his wife, a ranch known as the Ranch of Galisteo which is situated in the county of Santa Fe and Territory aforesaid, known as the ranch which was formerly of the deceased Don Miguel E. Pino, and that I will give and execute the documents of conveyance of the said ranch in favor of Jesus M. Sena y Baca and Agapita Ortiz, as soon as there shall be adjudicated and approved by the Surveyor General the Grant of Bartolome Baca of a tract which was ceded to him by the Governor Melgarez in the year 1819, and the which is situate in the county of Valencia in the Territory of New Mexico, and furthermore, they will take possession of the aforesaid ranch and will have and enjoy all the products of the same until the proper documents may be executed, and in conformity with the above.

*Id.* at 360, 93 P.762. The Court held that the language created an executory contract, that failed to convey title immediately. *Id.* at 364, 93 P. at 764. Despite containing "words of present purchase and sale," the Court concluded that the instrument plainly conditioned title upon the adjudication of the Baca Land Grant and the subsequent

14

execution of documents relating to that adjudication. *Id.* at 364-65.

The settlement agreement in this case requires a similar interpretation. As the district court found below, the settlement agreement "did not effect a partition of the [eight]-acre parcel" at the time it was executed. Instead, after promising that the eight-acre tract "*will be awarded* to [Plaintiff]," the agreement places several conditions on that promise. For example, it provides that a survey must be completed prior to partition by a named surveyor; that the survey, as completed, shall identify an easement along the western boundary for ingress and egress; and that "[e]ach of the parties and his or her spouse will quitclaim the lot to the party to which it is awarded in the [a]rbitration [a]ward." Furthermore, the agreement is worded almost entirely in the future tense. It requires the parties to share the costs of surveying the property and recording all necessary documents.

Plaintiff contends that the agreement was unconditional. He argues that the exchange of quitclaim deeds between the parties "was a mere housekeeping matter." We disagree. As stated above, the settlement agreement clearly made partition conditional. In what is perhaps the most conditional language of all, the agreement states that "*Upon the satisfaction of the terms and provisions set forth above*, the parties . . . will execute [r]eleases and any and all other documents as may be reasonable and necessary in order to discharge each other from any and all claims

related to . . . this [s]ettlement [a]greement."

The record establishes that these "terms and provisions" remained unsatisfied until at least March 10, 2004, when a final plat was recorded and quitclaim deeds were executed between the parties. Thus, until that time, Plaintiff remained a tenant in common. As such, he did not have authorization to vote on behalf of his fellow tenants, and his March 8, 2002, vote to amend the restrictive covenants was invalid. Without Plaintiff's vote, the 2002 Amendments themselves fail because they did not pass by a vote of 80%. That Plaintiff took physical possession of the eight-acre tract, was excluded from trespassing on his cotenants' twenty-seven acres, and made costly improvements to his own parcel did not destroy the tenancy in common. If the terms of the settlement agreement were not so plain, such facts might tend to establish the parties' intent to effectuate an immediate partition. *See, e.g.*, *Gurule v. Chacon*, 61 N.M. 488, 489, 303 P.2d 696, 697 (1956) (holding that even an invalid partition might become valid if a party later takes "possession of the tract, assert[s] acts of ownership, or do[es] other things denoting an acceptance"). But as it stands, the settlement agreement's plain language clearly conditions partition of the estate on the occurrence of mutual obligations that were unfulfilled at the time of the vote.

Moreover, we are not persuaded by Plaintiff's argument that his vote, cast as a tenant in common, somehow ripened when the parties finally exchanged quitclaim

deeds and recorded a final plat with the county. This assertion fails under the plain language of the original restrictive covenants, which require all amendments to pass by means of "written approval of *owners* of at least eighty percent (80%) of the acreage." (Emphasis added). At the time Plaintiff cast his vote, he owned only a tenancy in common for which he possessed no authorization to vote. Thus, Plaintiff cannot realistically be classified as an "owner" as that term is used in the amendment procedures. He was ineligible to cast a vote, and any vote he made was therefore void and could not have become valid when he actually achieved ownership in fee.

Because the 2002 Amendments were invalid, the two-and-a-half-acre minimum lot size restriction was not binding upon Defendants. We therefore affirm the district court's order of summary judgment on this issue.

**The District Court's Award of Attorney's Fees**

**A.    Procedural Context**

Defendant Victoria appeals an order of the district court awarding attorney's fees to Plaintiff. On August 3, 2006, Victoria filed a motion requesting her dismissal from the administrative appeal pursuant to Rule 1-012(B) NMRA. Specifically, she argued that since she was "not an administrative agency[,]" she was improperly made a party to Plaintiff's administrative appeal under Rule 1-074. The district court held a hearing to consider the matter, at which Victoria argued she could add nothing of

substance to the appeal. Defense counsel stated, "As we've mentioned in our motion, there's nothing that she can add as a named party in this case other than to say that [Defendants] turned over the necessary documents to the Board . . . and allowed the Board . . . to do its job." The court made the following finding in response:

> The only real—the only participation involving her is whether she chooses to participate in the briefing and oral argument, and I don't—I don't really mind—I mean, I've got to tell you. I've read the motion. I don't think there's any question I have jurisdiction over the case[] and jurisdiction over her as an applicant whose decision below is being appealed to me. So I don't think there's a jurisdictional basis to exclude it. If she doesn't want to expend attorney's fees or just doesn't really want to give any input, I don't really mind waiving her—you know, ordering that she does not have to file a brief if she chooses not to."

The court went on to state that Victoria "is going to be bound by whatever I decide, either affirming the decision of the Board . . . or overturning it." Furthermore, the court stated "If [Victoria] chooses not to file a response to the [s]tatement of [a]ppellate [i]ssues, that's acceptable to me. She can choose to rely on what the other Appellees do in responding to the brief, and I take no offense at that. But as far as her remaining a party, I believe she does because she will be bound by the result." A month later, the court stayed Plaintiff's administrative appeal pending the outcome of his complaint for declaratory judgment. When Plaintiff filed that complaint, all Defendants except Victoria submitted responsive pleadings. In a second hearing, on November 28, 2006, the issue of whether Victoria was required to file responsive

pleadings in the administrative appeal came up again. She reasserted her contention that there was "no real purpose for [her] to be involved" and expressed a concern over expending resources on additional, unnecessary briefing. The court stated, if Victoria "doesn't want to participate or file any briefs, that's okay. I don't mind that. But because of the interest she has in land, she will be bound by whatever result comes about. So she's not required to participate, but she remains as a party." The court then concluded that "the extent of her participation is really up to her."

Because Victoria had failed to file an answer to his complaint for declaratory judgment, Plaintiff moved for default judgment against her on February 21, 2007. Victoria responded to that motion on March 6, 2007. She argued that default judgment against her would be improper because "The [c]ourt . . . ruled that while [Victoria] would remain as a named [D]efendant in this case, [her] decision not to answer the [c]omplaint . . . 'is really up to her[.]'" More than a month later, at a hearing on the motion for default, the court expressed incredulity.

> THE COURT: I really thought my statements to [Victoria] were quite clear. I can't, for the life of me, see how counsel and [Victoria] can say I said she doesn't have to respond to anything and nothing would ever happen to her, when the clear focus of my statement was if she doesn't object to the relief that's being sought, she doesn't have to respond. This position, to me, is just extraordinary, frankly. The law does not prefer default judgments, and I have to tell you that this is a tough one—
>
> [COUNSEL]: Your honor—

19

THE COURT: Don't interrupt me. This one is a difficult one, because the way [Victoria] has proceeded in this case without responding, in light of the [c]ourt's comments, is extremely troubling, but the law does not prefer default judgment. It prefers to address things on the merits.

Here's what I do. I grant [Victoria] until the close of business tomorrow to file a responsive pleading. If no responsive pleading is filed, submit your default judgment.

Victoria filed an answer to Plaintiff's complaint as permitted by the court. Plaintiff then filed a motion for attorneys fees and costs on the basis of Victoria's alleged "frivolous arguments and delay." Plaintiff argued that the court should award such costs and fees under Rule 11 and its powers of equity. On October 3, 2007, the district court held a hearing on Plaintiff's motion in which it awarded attorneys fees to Plaintiff in the amount of $3,670.27.[1] In doing so, the court stated, "I hope you will finally understand this, when I [stated you did not have to file responsive pleadings], the case was an [a]dministrative [a]ppeal. That statement did not apply in any way to a [c]omplaint for [d]eclaratory [j]udgment. So you have, in my view, misinterpreted that repeatedly." As the court concluded,

I have to say I do not understand [Victoria's] and her counsel's actions and tactics in this litigation. I do know that the actions and tactics have dramatically increased the time of litigation and cost of the litigation, there's really no question about that, which is, in my view, completely inconsistent with her stated goal of not incurring time or costs.

---

[1]Despite Plaintiff's arguments to the contrary, we observe that the issue of attorney's fees was preserved upon the filing of Victoria's response to Plaintiff's motion for attorney's fees.

The court went on to say that no reasonable attorney would have interpreted the court's statements as applying to both the administrative appeal and the declaratory judgment action. "It is just not within the realm of reasonable attorney practice to believe that that was what was intended by the [c]ourt."

**B.    Standard of Review**

We apply an abuse of discretion standard to appeals of attorney's fees. *Paz v. Tijerina*, 2007-NMCA-109, ¶ 8, 142 N.M. 391, 165 P.3d 1167. District courts have broad discretion to award such fees. However, we review de novo any legal conclusions that occurred below. *Fort Knox Self Storage, Inc. v. W. Techs., Inc.*, 2006-NMCA-096, ¶ 29, 140 N.M. 233, 142 P.3d 1. An abuse of discretion occurs when the court's decision is contrary to logic and reason or is not in accordance with the law. *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 6, 127 N.M. 654, 986 P.2d 450. "The test is not what we would have done had we heard the fee request, but whether the [district] court's decision was clearly against the logic and effect of the facts and circumstances before the court." *In re Estate of Greig*, 107 N.M. 227, 230, 755 P.2d 71, 74 (Ct. App. 1988).

**C.    Order Awarding Attorney's Fees Was Not an Abuse of Discretion**

The rule in New Mexico is that attorney's fees are proper "only when authorized by statute, court rule, or an agreement expressly providing for their

recovery." *Garcia v. Jeantette*, 2004-NMCA-004, ¶ 16, 134 N.M. 776, 82 P.3d 947. However, this standard remains subject to three exceptions: "(1) exceptions arising from a court's inherent powers to sanction the bad faith conduct of litigants and attorneys, (2) exceptions arising from certain exercises of a court's equitable powers, and (3) exceptions arising simultaneously from judicial and legislative powers." *Clark v. Sims*, 2009-NMCA-118, ¶ 21, 147 N.M. 252, 219 P.3d 20 (internal quotation marks and citation omitted), *cert. denied*, 2007-NMCERT-009, 147 N.M. 421, 224 P.3d 648. Our courts "may award attorney fees to vindicate [their] judicial authority and compensate the prevailing party for expenses incurred as a result of frivolous or vexatious litigation." *Seipert v. Johnson*, 2003-NMCA-119, ¶ 12, 134 N.M. 394, 77 P.3d 298 (internal quotation marks and citation omitted).

In this case, we cannot say that the district court abused its discretion in awarding attorney's fees. When the court told Victoria she did not have to file responsive pleadings, it was clearly discussing the administrative appeal, not Plaintiff's complaint for declaratory judgment. Indeed, both times the court made statements permitting Victoria to forego filing, it did so in the context of the administrative appeal. Accordingly, the court chose to impose fees based on its finding that no reasonable attorney could conclude Victoria had permission to refrain from filing an answer. On such facts, we are unable to hold that an abuse of discretion

22

occurred.  Our courts "must have inherent power to impose a variety of sanctions on both litigants and attorneys in order to regulate their docket, promote judicial efficiency, and deter frivolous filings." *State ex rel. N.M. State Highway & Transp. Dep't v. Baca*, 120 N.M. 1, 4, 896 P.2d 1148, 1151 (1995) (internal quotation marks and citation omitted).  Courts "must be able to command the obedience of litigants and their attorneys if [they are] to perform [their] judicial functions." *Id.*

**D.      Notice of Intent to Seek Default Judgment**

Nor are we persuaded by Victoria's argument that we should reverse the district court's award of attorney's fees because she received inadequate notice.  Plaintiff in this case complied with both Rule 1-055(B) NMRA  as well as *DeFillipo v. Neil*, 2002-NMCA-085, 132 N.M. 529, 51 P.3d 1183.

Rule 1-055(B) provides that "[i]f the party against whom judgment by default is sought has appeared in the action, the party . . . shall be served with written notice of the application for judgment at least three (3) days prior to the hearing on such application[.]"  Plaintiff complied with this requirement.  On February 21, 2007, Plaintiff's motion for default judgment was served on Victoria's attorney.  The court held a hearing on the motion on April 12, 2007, at which it gave Victoria additional time to answer Plaintiff's complaint for declaratory relief.  Thus, Victoria received more than the three days notice required by Rule 1-055(B).

Victoria cites *DeFillipo* for the proposition that "the party intending to file a motion for default judgment 'should give notice of intent to seek a default.'" That rule, however, is tethered to the language which precedes it in *DeFillipo*, namely:

> [T]he 'spirit' of Rule 1-055(B) counsels that a party seeking entry of default or default judgment against parties with whom it is in contact, about whose whereabouts are known, and to whom it even represented that no default judgment would be entered during negotiations should give notice of intent to seek a default.

2002-NMCA-085, ¶ 26. Victoria fails to discuss this language in her brief, but we hold that it is controlling. *DeFillipo* is inapplicable in this case because nowhere do the parties assert that Plaintiff expressed any intent to refrain from filing for default. As such, the only applicable notice requirements were those of Rule 1-055, with which Plaintiff indisputably complied.

**CONCLUSION**

For the reasons set forth above, we affirm the district court in all respects.

**IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Judge**

24

**WE CONCUR**:

_____

**MICHAEL D. BUSTAMANTE, Judge**

_____

**LINDA M. VANZI, Judge**